T.C. Memo. 2013-253

UNITED STATES TAX COURT

BUYUK LLC, BOYALIK LLC, A PARTNER OTHER THAN THE TAX
MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

BEYAZIT, LLC, RP CAPITAL PARTNERS LLC, A PARTNER OTHER THAN
THE TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11051-10, 6853-12.          Filed November 6, 2013.

<u>Eric E. Kalnins</u> and <u>Gabriel G. Tsui</u>, for petitioners.

<u>Jennifer N. Brock</u>, <u>Gretchen Ann Kindel</u>, and <u>Jeffrey S. Luechtefeld</u>, for

respondent.

**[\*2]**          MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  These cases are partnership-level proceedings subject to the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648.  In separate notices of final partnership administrative adjustment (FPAA), respondent disallowed a deduction of $4,458,816 that Buyuk LLC (Buyuk) claimed on its 2003 Form 1065, U.S. Return of Partnership Income, and a deduction of $12,223,174 that Beyazit LLC (Beyazit) claimed on its 2003 Form 1065.  The FPAAs also determined, among other things, accuracy-related penalties applied to any underpayments of tax attributable to the disallowances.  Respondent's primary determination in that respect was that for each partnership the penalty equaled 40% of the underpayment because of a gross valuation misstatement under section 6662(h).[1]  Alternatively, respondent determined that the penalty equaled 20% of the underpayment because of negligence or disregard of rules or regulations under section 6662(b)(1), a substantial understatement of income tax under section 6662(b)(2), or a substantial valuation misstatement under section 6662(b)(3).  As a

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year in issue (Code), Rule references are to the Tax Court Rules of Practice and Procedure, and some dollar amounts are rounded.

[*3] result of our findings today under the concepts of disguised sales under section 707(a)(2)(B), the substance over form and step transaction doctrines, and the economic substance doctrine, we sustain respondent's determinations in the FPAAs to the extent set out in this opinion.

## FINDINGS OF FACT

The parties filed with the Court a stipulation of facts and a supplemental stipulation of facts, both with accompanying exhibits. Those facts and exhibits are incorporated herein by this reference. We find the facts accordingly. Buyuk's and Beyazit's principal place of business was Greenwich, Connecticut, when the petitions were filed.

Gramercy Advisors LLC

Marc Helie and Robert Koenigsberger founded Gramercy Advisors LLC in 1998 to manage hedge funds investing in emerging market debts. Gramercy Advisors' affiliated entities include Gramercy Asset Management LLC, Gramercy Financial Services LLC (GFS), and Mead Point Capital Management LLC (collectively, Gramercy).

From its inception to at least 2004, Gramercy operated its flagship fund, the Gramercy Emerging Markets Fund (GEMF), using several feeder entities. One feeder was an LLC for domestic investors, and another was a Cayman Islands

[*4] company for foreign investors. A domestic investor would purchase a membership interest in GEMF LLC, and Gramercy itself would not have an equity interest in that LLC. The GEMF invested primarily in distressed, defaulted, or undervalued emerging market debt securities issued by a country (sovereign debt) or a corporation (corporate debt) that were denominated in U.S. dollars.[2] The GEMF did not invest in consumer receivables or accounts receivable.

The GEMF's reason to focus on sovereign debt instruments was twofold. First, the concept of bankruptcy would not apply to a central government issuing the debt instruments. Further, these types of instruments were susceptible to positive restructuring outcomes because of a sovereign government's need to maintain access to global capital markets. Along the same vein, as to corporate debt securities the GEMF focused on foreign corporations that were important to their respective countries' economies. In such a case, the government of the foreign country in which the foreign corporation operated would have a vested interest in ensuring the viability of that corporation and thus favorable restructuring outcomes for international investors in the securities issued by the corporation. These foreign corporations the GEMF targeted would also have

---

[2]Mr. Helie testified that he might have purchased some distressed debts denominated in Thai baht around 1997 and 1998. Nothing in the record indicates GEMF invested in any other debt denominated in local currency.

[*5] cross-border revenues and multinational assets that could mitigate the impact of any currency devaluations. Finally, to avoid exposure to foreign exchange fluctuations and application of unfamiliar foreign laws, the GEMF concentrated on U.S. dollar denominated instruments issued in the international capital markets and subject to the laws of either New York or the United Kingdom.

The GEMF's investment philosophy did not include buying and holding an investment to earn interest or otherwise to collect on the debt securities. Instead, it involved buying a sovereign or corporate debt security early and capitalizing on an increase in price by selling the security before an impending restructuring of the debt or after the restructuring. At times, Mr. Helie would take an active role in the restructuring of the debt instruments. In addition, the GEMF would typically purchase the debt instrument directly instead of purchasing an interest in an entity holding the debt instrument. The GEMF's investors would pay an annual management fee of 1% of assets under management, a performance fee equal to 20% of return net of management fee and expenses, and a redemption fee of 2% of the redeemed amount during the first 12 months or off semiannual cycle after the first 12 months. Gramercy also imposed concentration limits on the GEMF's investments intended to diversify the GEMF's portfolios and to prevent the fund from investing too heavily in one particular region or specific type of asset.

[*6] BDO Seidman LLP

BDO Seidman LLP (BDO) is an accounting firm which from at least 2000 through 2003 promoted and sold a number of "tax solutions" products through its Tax Solutions Group (TSG). BDO's management marketed these tax solutions within the firm by providing incentives to its employees and partners for participating in the sales of these tax solutions. These incentives included bonuses and firmwide recognition. One form of recognition was a firmwide email with the subject line "Tax $ell$" announcing the sale of a tax solution, the employee who generated the sale, and the fee arising from the sale. The amount of any bonus paid to an employee was tied to the net fee BDO was able to earn from selling a tax solution.

One of these tax solutions BDO promoted to its clients through TSG was a highly structured distressed debt investment product (BDO distressed debt structure).

The BDO distressed debt structure involved an investment in foreign consumer receivables with high cost basis and low fair market value. BDO required the consumer receivables be overdue and denominated in a foreign currency that had suffered significant devaluation relative to the U.S. dollar. Under the BDO distressed debt structure, the foreign owner of the receivables

[*7] would transfer and assign the receivables to a U.S. limited liability company (LLC) under a contribution agreement in exchange for a membership interest in a "master" LLC solely managed by a Gramercy entity. The master LLC would then contribute the consumer receivables to a second LLC (level A LLC) in exchange for a membership interest in the level A LLC; a Gramercy entity would also acquire and maintain a 1% interest in the same LLC. The client would then acquire approximately 90% of the master LLC's membership interest in the level A LLC in exchange for cash. After the client's cash purchase of the membership interest in the level A LLC, the foreign company would redeem its membership interest in the master LLC for cash. The client would become the sole manager of the level A LLC and contribute securities or additional cash to the level A LLC. The level A LLC would then contribute the consumer receivables to a second LLC (level AA LLC) in exchange for a membership interest in the level AA LLC. The level A LLC would own 99% of the level AA LLC, and a Gramercy entity would be the manager and own 1% of the level AA LLC. Following this contribution, the consumer receivables would be swapped for assets of another Gramercy LLC to achieve the desired tax effect of recognizing the inherent loss in the consumer receivables.

**[*8]**    To sell the tax sheltering product, according to Paul Shanbrom, a BDO employee from the TSG group, someone from that group would typically first meet with the potential client with an understanding of the amount of tax loss the client was looking to generate to shelter the client's income. The BDO employee would discuss the distressed debt investment product, the steps and the mechanics involved in the structured transaction, the types of investments the client would be making in the overall transaction, and how the transaction would generate the desired tax loss to offset income.

In return for its devised structure and a tax opinion supporting the structure, BDO would receive fees from the client. The fees were based on a percentage of the tax loss to be generated, which depended on the character of the desired tax loss: 8% to 10% for ordinary losses and 6% to 7% for capital losses. BDO would also pay a fee to Gramercy for sourcing the distressed assets.

Gramercy's Managed Account Business

Beginning at least by 2000, BDO began to refer clients to Gramercy to facilitate its clients' participation in the BDO distressed debt structure. To increase its client base, Gramercy was willing to accommodate these clients by expanding its operations to include an element that Gramercy had not considered before. This additional element involved the clients' investing in distressed debts

**[*9]** meeting BDO's criteria outlined above (DAD account). In exchange for implementing the distressed debts transactions through a DAD account, Gramercy would require the BDO-referred client to make separate, additional investments in instruments that mirrored Gramercy's traditional hedge fund business and tracked the GEMF (managed EMF account), appoint Gramercy as its investment manager with respect to these accounts, and contribute to these accounts specified amounts of cash. These two types of investments, a DAD account and a managed EMF account, together formed what Gramercy has referred to as a "managed account" for each client BDO referred.

Each BDO-referred client or group of clients had his, her, or its own managed account. For one managed account, the BDO-referred client (or a group of these clients) would invest roughly 15% of the desired tax loss in the managed account. To facilitate a distressed debt transaction, through a DAD account meeting the criteria for a BDO distressed debt structure, Gramercy would source the qualified distressed debts on BDO's behalf and receive a fee from BDO in return. For the managed EMF account, Gramercy invested in instruments of the same type and in the same proportion as those in which the GEMF invested.

[*10] Sourcing of the Distressed Debts

Mr. Helie was responsible for sourcing accounts receivable used in the BDO distressed debt structure and focused his search on receivables from Russian utility companies with the type of inherent tax loss that BDO had asked for. In that connection, he solicited help from two individuals with whom he had previously worked, Rich Straughan and Gregor Short, to identify receivables that had suffered from ruble devaluation in 1998. When he was able to identify potential receivables to be acquired, he engaged a Russian law firm, ALM Feldmans, to provide advice on the particular transaction.

One such Russian utility company whose accounts receivable were so identified was OAO Saratovenergo (Saratov). During the relevant times, Saratov, an open joint stock company organized under the laws of the Russian Federation, provided energy to consumers in the Saratov region of Russia and was part of the Unified Energy System, which was a state-owned enterprise overseeing a consolidated group of 72 electric generation facilities in Russia.

During the negotiation over the transfer of its receivables, Saratov expressed concerns that it would not immediately receive cash payment for its receivables. Mr. Helie understood Saratov wanted cash for the receivables and not an interest in a U.S. LLC. However, Saratov's concern was ameliorated once it

[*11] was told that it would receive cash payments for its receivables as soon as BDO identified an individual or individuals who would participate in the BDO distressed debt structure.

In early 2002 ALM Feldmans, with Mr. Straughan's assistance, engaged John Hall, director of Legal and Financial Services Ltd., and provided him a power of attorney from Saratov (Saratov POA).[3] Acting ostensibly under the Saratov POA, Mr. Hall formed EROSE LLC (EROSE), organized in Delaware, to hold distressed foreign debt to be used in the BDO distressed debt structure. Gramercy was the sole manager of EROSE from its inception. Around March 1, 2002, Mr. Hall, again acting ostensibly as "attorney for" Saratov under the Saratov POA, executed an assignment agreement that purported to assign to EROSE all of Saratov's rights to and interests in certain accounts receivable in a total face amount of RUB 2,195,102,103 that were due from 46 of its commercial customers (Saratov receivables). The Saratov receivables represented approximately 13% of Saratov's total assets in book value. Using RUB/USD exchange rates for 1996,

---

[3]We held an evidentiary hearing on March 1, 2013, on respondent's motion in limine challenging the authenticity of the Saratov POA. On March 22, 2013, we denied respondent's motion, finding that the Saratov POA was authentic. However, the ruling left open the issue of "whether there was a valid and effective transfer of the subject accounts receivable." Our opinion today renders this issue moot.

**[*12]** 1997, and 1998, EROSE's Form 1065 for 2002 reported this transfer as "capital contributed" of $368,815,654 by Saratov.[4]  Gramercy recorded this same amount as EROSE's tax basis.  Using the RUB/USD exchange rate of 31.027 on the date of the contribution, the Saratov receivables had an equivalent face value of $70,748,126 as of the date of contribution.

The Saratov receivables were different from the type of emerging market debt securities in which the GEMF would typically deal in that the Saratov receivables were denominated in a local currency and much less liquid than many other instruments, making it difficult to find a buyer at the time.  The debt instruments were also highly distressed and remained outstanding when they appeared to be overdue by at least four years.  Moreover, Saratov did not appear to have any of the cross-border revenues or multinational assets that the GEMF typically looked for to mitigate the impact of any currency devaluations.  Finally, the managed accounts did not have any concentration limits that Gramercy imposed on the investments in the GEMF to prohibit the GEMF from investing too heavily in one particular region or specific type of asset.

Gramercy assigned a fair market value of $3,931,338 to the Saratov receivables as of March 1, 2002, around the time when Saratov contributed the

---

[4]The average implicit RUB/USD exchange rate would be 5.95176 to 1.

[*13] receivables to EROSE.  The fair market value was determined by applying a percentage to the face amount of each receivable before converting that amount to U.S. dollars using the then-applicable RUB/USD exchange rate.  On March 2, 2002, Gramercy purportedly became a 1% member of EROSE by contributing to EROSE promissory notes issued by entities owned by Gramercy's principals and with stated values of $39,710.49.  The notes were unsecured and payable on demand and bore annual interest of 3%.

As contemplated by the overall BDO distressed debt structure, Saratov (purportedly through Mr. Hall and Gramercy) entered into a collection and servicing agency agreement on May 1, 2002 (collection agreement).   The collection agreement provided that Saratov would collect, service, and manage the Saratov receivables for EROSE.  Under the collection agreement, Gramercy would be entitled to receive 10% of the face value of the Saratov receivables, or RUB 219,510,210 (10% deductible), before any payout to Saratov.  Any collection in excess of this 10% deductible would be shared between Gramercy (25%) and Saratov (75%).  In other words, Gramercy could receive up to 32.5% of the face value of the Saratov receivables if Saratov collected 100% of the receivables at their face value.  Gramercy took no action other than entering into the collection

[*14] agreement to collect on the Saratov receivables; no money was ever collected from these receivables.

James A. Cochran and Richard Perlman

In 2003 James A. Cochran and Richard Perlman worked for PracticeWorks, Inc. (PracticeWorks), as chief financial officer and chairman of the board, respectively. With the announcement in July 2003 of Eastman Kodak Co.'s impending acquisition of PracticeWorks, which was consummated in October 2003, Messrs. Cochran and Perlman expected large payouts from their severance packages and the sale of PracticeWorks shares and stock options; Mr. Cochran projected a payout of approximately $5 million, and Mr. Perlman projected approximately $17 million. In fact, Messrs. Cochran and Perlman reported wages (including severance and compensation on the sale of PracticeWorks stock options) of $4,679,610 and $12,049,049, respectively, on their 2003 Federal individual income tax returns.

In or around August 2003 BDO met with Messrs. Cochran and Perlman to discuss investing in entities that managed distressed debt instruments. Mr. Shanbrom was involved in the sale of the BDO distressed debt structure to Messrs. Cochran and Perlman. To facilitate Messrs. Cochran's and Perlman's participation in the promoted structure, BDO referred the two to Gramercy to

[*15] become investors in Gramercy's managed accounts, each of which would, as noted above, consist of a DAD account investing in distressed Russian accounts receivable, such as the Saratov receivables, and a managed EMF account that mirrored and tracked the GEMF. After meeting with Gramercy in or about September 2003, Messrs. Cochran and Perlman each entered into an investment management agreement (IMA) with Gramercy and signed letters of representations and warranties in connection with the IMA.

Transactions at Issue

### Mr. Cochran, Boyalik LLC, and Buyuk (Buyuk Transaction)

Under his IMA with Gramercy, Mr. Cochran committed $600,000[5] to Gramercy for investment in instruments tracking those in which the GEMF invested, i.e., sovereign and corporate debt in emerging markets. To compensate BDO for its devised structure and introduction to Gramercy, Mr. Cochran, who was earning an annual salary of $175,000 at PracticeWorks at the time, paid BDO a $200,000 fee under a consulting agreement dated September 17, 2003, that did not cover any other services BDO provided. Mr. Cochran paid BDO another

---

[5]This amount equals 15% of the ordinary loss Mr. Cochran claimed on his 2003 Federal income tax return, see infra, which corroborates Mr. Shanbrom's testimony that a BDO-referred client was asked to invest in cash equal to 15% of the anticipated tax loss.

**[*16]** $5,000 fee under a Tax Audit Representation Agreement (TARA), but he did not actually receive any services under the TARA. Mr. Cochran also paid $25,000 for a tax opinion from Kilpatrick Stockton on the Buyuk transaction as well as $5,000 to Register & Akers to prepare a report on Gramercy.

Buyuk and Boyalik LLC (Boyalik), which Gramercy formed on May 27, 2003, both LLCs organized in Delaware, would become the LLCs used in connection Mr. Cochran's managed account. On September 26, 2003, EROSE contributed certain portions of three of the Saratov receivables (Buyuk receivables), with a face value of RUB 27,491,732 and a value of $66,486.64 as of the date of contribution, to Boyalik in exchange for a 98.9% interest in Boyalik. The Buyuk receivables were:

| Debtor | Date of origination | Face value (in RUB) |
|---|---|---|
| OAO Khimvolvokna | 6/30/1998 | 23,261,150 |
| AOOT Yershovsky Kam | 12/31/1997 | 433,000 |
| AO Orashayemoye | 12/31/1997 | 3,797,582 |

As a step of the integrated BDO distressed debt structure that contemplated the forming of a partnership for Federal income tax purposes, Gramercy contributed to Boyalik participation interests of 0.1849% in two promissory notes

[*17] with a face value of $400,000 (Gramercy notes), or $739, in exchange for a 1.1% interest; Gramercy was named manager of Boyalik. For sourcing the Buyuk receivables in connection with Mr. Cochran's participation in the BDO distressed debt structure, Gramercy sought and received fees from BDO of $64,600.

Using the RUB/USD exchange rates applicable on the alleged dates of origination, Boyalik recorded the total face value of the Buyuk receivables as $4,528,047. As noted above, Gramercy assigned the Buyuk receivables a value of $66,487 as of September 26, 2003. Gramercy arrived at this value first by determining that the Buyuk receivables were worth 7.38% of their face value and then by converting this amount to U.S. dollars using the prevailing RUB/USD exchange rate, 30.5235, on September 26, 2003.

On October 13, 2003, Mr. Cochran paid EROSE $60,579 for 90% of EROSE's 98.9% interest in Boyalik and replaced Gramercy as sole manager. On the same day, Boyalik contributed the Buyuk receivables to Buyuk for a 98.9% interest in Buyuk. As an integral step in the BDO distressed debt structure that contemplated the forming of a partnership for Federal income tax purposes, Gramercy contributed its participation interests of 0.1872% in the Gramercy notes to Buyuk, valued at $748, for a 1.1% interest in Buyuk. Gramercy was the managing member of Buyuk, and Mr. Cochran was not involved in Buyuk's daily

[*18] operations.  For the investment management services, Gramercy charged Mr. Cochran an annual fee equal to 3% of the net asset value held in Buyuk--in contrast to the 1% the GEMF typically charged its clients--and a performance fee equal to 20% of any net profit--the same percentage the GEMF charged its clients. Gramercy valued the Buyuk receivables at $67,319 as of October 13, 2003, using the then-prevailing RUB/USD exchange rate.[6]

On November 1, 2003, Mr. Cochran contributed $539,421 in cash to Boyalik, and Gramercy contributed $6,000 in additional participation interests in the Gramercy notes.  Together with his cash payment for his interest in Boyalik, Mr. Cochran's cash contribution on November 1 satisfied his commitment under the IMA to invest $600,000 with Gramercy.  On the same day, Boyalik contributed the $539,421 in cash received from Mr. Cochran to Buyuk, and Gramercy contributed additional participation interests in the Gramercy notes to maintain its 1.1% interest.  Gramercy invested the cash contribution in the managed EMF account.

---

[6]As noted above, Gramercy decided the Buyuk receivables were worth 7.38% of their face value.  Applying the RUB/USD exchange rate of 30.1462 prevailing on October 13, 2002, Gramercy assigned the Buyuk receivables a value of $67,319.

**[*19]** On December 22, 2003, Mr. Cochran contributed to Boyalik his account held at Goldman Sachs that he and Gramercy valued at $3.4 million. Gramercy contributed additional participation interests in the Gramercy notes to Boyalik to maintain its 1.1% interest. By the end of 2003, EROSE had a 0.17% interest in Boyalik; Mr. Cochran and Gramercy held 98.73% and 1.1% interests, respectively.

At BDO's direction, Gramercy, without considering whether it was a good time to sell the Buyuk receivables, caused Buyuk to sell all of the Buyuk receivables to GFS (a Gramercy entity) for $69,231 on December 26, 2003. The face amount of the Buyuk receivables was $937,884 on that date.

On its 2003 Form 1065, Buyuk reported an ordinary foreign currency gain of $1,914 on the purported sale of the Buyuk receivables computed as follows:

| Security | Basis | Proceeds | FX Gain |
|---|---|---|---|
| Khimvolokna | $56,958 | $58,578 | $1,620 |
| Yershovsky Kam | 9,299 | 9,563 | 264 |
| Orashayemoye | 1,060 | 1,090 | 30 |
| Total | 67,317 | 69,231 | 1,914 |

Buyuk allocated 98.9% of the foreign currency gain ($1,893) to Boyalik and 1.1% ($21) to Gramercy. Boyalik in turn allocated 90% of the foreign currency gain ($1,704) to Mr. Cochran and 10% ($190) to EROSE.

**[*20]**   On the 2003 Form 1065, Buyuk also claimed an ordinary loss deduction, identified as "Sale of Debt Instruments - Section 988", of $4,458,816 on the purported sale of the Buyuk receivables computed as follows:

| Basis | Proceeds | Gain (Loss) |
|---|---|---|
| $4,528,047[1] | $69,231 | ($4,458,816) |

[1]The Buyuk receivables took a basis in the amount of the receivables' face value using the RUB/USD exchange rate applicable on the alleged dates of origination.

Buyuk allocated the entire loss deduction claimed to Boyalik, which in turn allocated 90% of the claimed loss, or $4,012,934, to Mr. Cochran and 10%, or $445,882, to EROSE. On their 2003 Federal income tax return, Mr. Cochran and his then wife claimed an ordinary loss deduction from Boyalik of $3,971,000, which effectively offset approximately 85% of Mr. Cochran's reported wages for 2003.

### Mr. Perlman, Bekoz LLC / RP Capital Partners LLC, and Beyazit LLC (Beyazit Transaction)

The transaction relating to Mr. Perlman is effectively identical to that involving Mr. Cochran.  We will note only the main differences here.

[*21] Under his IMA with Gramercy, Mr. Perlman was committed to invest $1,650,000[7] with Gramercy in instruments tracking the GEMF. Mr. Perlman paid BDO $500,000 with respect to his Consulting Agreement and $20,000 with respect to his TARA. Mr. Perlman also paid $75,000 to Kilpatrick Stockton for a written tax opinion on the transaction and $5,000 to Register & Akers to prepare a report on Gramercy.

The equivalents of Buyuk and Boyalik are Beyazit LLC (Beyazit) and RP Capital Partners LLC (RP Capital) (formerly Bekoz LLC),[8] respectively, which Gramercy also formed on the same day it formed Buyuk and Boyalik.

On September 26, 2003, EROSE transferred certain Saratov receivables to RP Capital (Beyazit receivables) with a face value of RUB 76,050,650 in exchange for a 98.9% interest in RP Capital while Gramercy contributed participation interests of 0.5114% in the Gramercy notes, or $2,046, for a 1.1% interest; Gramercy was named manager of RP Capital. As was the case with Mr. Cochran's managed account, Gramercy's becoming a member of RP Capital was

---

[7]Again, this commitment represents 15% of the ordinary loss Mr. Perlman claimed on his 2003 Federal income tax return.

[8]This second-level LLC was first named Bekoz LLC. On November 13, 2003, Bekoz LLC was renamed RP Capital Partners LLC after Mr. Perlman. For ease, we will refer to this second level LLC as RP Capital throughout the opinion.

[*22] essential to the BDO distressed debt structure in relation to Mr. Perlman's

managed account.  The Beyazit receivables, which Gramercy valued at $183,917

as of September 26, 2003, included the following:

| Debtor | Date of origination | Face value (in RUB) |
|---|---|---|
| OAO Khimvolokna | 6/30/1998 | 74,850,650 |
| AOOT Saratovsky Kame[1] | 6/30/1998 | 1,200,000 |

[1]The Saratovsky Kame receivable was not listed in the assignment
agreement between Saratov and EROSE or in the contribution agreement between
EROSE and RP Capital; it was rather added as part of the Beyazit receivables in
November 2003.  There is nothing in the record showing that an account
receivable due from AOOT Saratovsky Kame was transferred from Saratov to
EROSE or from EROSE to RP Capital or from RP Capital to Beyazit.  While we
have reservations over whether the Saratovsky Kame receivable was ever
transferred from Saratov to EROSE and from EROSE to RP Capital, our opinion
today renders this issue moot.

On October 13, 2003, Mr. Perlman paid EROSE $167,576 for 90% of

EROSE's interest in RP Capital and replaced Gramercy as the sole manager.  On

the same day, RP Capital contributed the Beyazit receivables to Beyazit for a

98.9% interest in Beyazit, and Gramercy contributed participation interests of

0.5178% in the Gramercy notes for a 1.1% interest.  Gramercy valued the RP

Capital receivables at $186,220 as of October 13, 2003 using the prevailing

RUB/USD exchange rate on that date.  Gramercy was again the managing member

**[*23]** of Beyazit and charged Mr. Perlman the same percentage fees that it charged Mr. Cochran in connection with his respective account; Mr. Perlman was not involved in the daily operations of Beyazit.

On November 1, 2003, Mr. Perlman contributed $1,482,424 in cash to RP Capital, which RP Capital immediately contributed to Beyazit; Gramercy contributed additional participation interests in the Gramercy notes. Mr. Perlman's cash contribution on November 1, 2003, together with his cash payment for his interest in RP Capital, satisfied his commitment under the IMA to invest $1,650,000 with Gramercy. On December 22, 2003, Mr. Perlman made an additional contribution to RP Capital that Mr. Perlman and Gramercy valued at $13,957,296,[9] and Gramercy contributed additional promissory notes. By the end of 2003, EROSE had a 0.12% interest in RP Capital; Mr. Perlman and Gramercy had 98.78% and 1.1% interests in RP Capital, respectively.

In a manner similar to the sale of the Buyuk receivables, Gramercy caused Beyazit to sell the Beyazit receivables without considering whether it was the right time to sell but rather did so at BDO's direction. On November 19, 2003, approximately one month after Beyazit acquired the Khimvolokna receivable from

---

[9]The contribution consisted of Mr. Perlman's account held at Goldman Sachs and certain partnership interest in Ovenworks.

[*24] RP Capital, Beyazit sold the receivable to GFS for $185,422 in cash.

Beyazit also sold the Saratovsky Kame receivable for $2,973 although it is unclear

from the  record when Beyazit sold it.[10]  The face amount of the Beyazit

receivables on November 19, 2003, was $2,552,207.

On its Form 1065 Beyazit reported an ordinary loss of $12,220,999 from the

sale of the Beyazit receivables as follows:

| Description | Sale price | Basis | Ordinary gain (loss) |
| --- | --- | --- | --- |
| Sale of foreign currency -- sec. 988 | $2,973 | $2,938 | $35 |
| Sale of foreign currency -- sec. 988 | 185,422 | 183,282 | 2,140 |
| Sale of debt instruments -- sec. 988 | 188,395 | 12,411,569 | (12,223,174) |
| Total | 376,790 | 12,597,789 | (12,220,999) |

Beyazit allocated 98.9% of the section 988 gain ($2,151) to RP Capital and 1.1%

($24) to Gramercy.  Beyazit allocated the entire section 988 loss to RP Capital.

RP Capital in turn allocated 90% of the section 988 loss ($10,998,921) to Mr.

Perlman and 10%  ($1,222,102) to EROSE.  On their 2003 return, Mr. Perlman

and his wife reported a "foreign currency loss from flow-throughs" of

---

[10]Beyazit's 2004 Form 1065 listed December 26, 2003 as the date of the sales of both receivables.

[*25] $10,998,921, which effectively offset approximately 91% of their reported wages for 2003.

Saratov's Redemption of Its Interest in EROSE

Throughout 2002 and 2003, Mr. Hall on Saratov's behalf requested partial withdrawals of Saratov's interest in EROSE; Mr. Hall made these requests upon the instruction of Mr. Straughan and the advice of Gramercy. Saratov's withdrawals, which together amounted to approximately 90% of what Gramercy deemed to be the fair market value of the Saratov receivables ($3,931,338) around March 1, 2002, are shown in the following table:

| Request date | Amount |
|---|---|
| 8/21/2002 | $98,420 |
| 11/6/2002 | 65,915 |
| 11/10/2002 | 108,253 |
| 12/4/2002 | 400,390 |
| 7/7/2003 | 749,994 |
| 8/27/2003 | 528,218 |
| 12/1/2003 | 321,368 |
| 12/10/2003 | 991,287 |
| 12/26/2003 | 281,366 |
| Total | 3,545,211 |

**[*26]** According to Mr. Cochran's account statement, $44,329 was expected to be paid to Saratov in connection with the Buyuk receivables. Gramercy's internal accounting spreadsheet also shows $124,577 was expected to be paid to Saratov in connection with the Beyazit receivables. Messrs. Cochran's and Perlman's payments to EROSE were sufficient to pay these amounts to Saratov.

## OPINION

### Burden of Proof

Taxpayers generally bear the burden of proof in a partnership-level proceedings such as these, see Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933), and petitioners conceded at trial that they have the burden of proof in these consolidated cases.

### Petitioners' Tax Positions

Petitioners, Boyalik and RP Capital, claim that the initial transfer of the Saratov receivables to EROSE, a purported partnership for Federal income tax purposes, was a valid transfer effected through the Saratov POA. Petitioners further claim EROSE's subsequent transfers of the Saratov receivables to them, as well as their transfers of their respective receivables to Buyuk and Beyazit, all of which purported to be partnerships for Federal income tax purposes, were also valid transfers.

[*27] Because the valid transfers were contributions of property to the partnerships subject to the subchapter K nonrecognition rules, petitioners argue, the partnerships each took a transferred basis of the receivables that they received. See secs. 721(a) and (b), 723. In other words, petitioners argue that Saratov's tax basis in the Buyuk receivables--that is, the receivables' face amount converted to U.S. dollars using the prevailing RUB/USD exchange rates on the receivables' origination dates--eventually became Buyuk's tax basis in the same receivables, which were transferred in a series of nonrecognition transactions from Saratov to EROSE to Boyalik and finally to Buyuk. Similarly, petitioners maintain that Saratov's tax basis in the Beyazit receivables became Beyazit's tax basis in those receivables, which were transferred also in a series of nonrecognition transactions from Saratov to EROSE to RP Capital and finally to Beyazit.

According to petitioners, upon disposition of the receivables, Buyuk and Beyazit each recognized a loss equal to the difference between the amount of cash received and its tax basis in the receivables sold. Because the losses recognized were losses inherent in the receivables in the hands of Saratov, petitioners contend, any such built-in loss had to be allocated to the contributing partner who had made the contribution in a nonrecognition transaction. Sec. 704(c). Because Buyuk had acquired the Buyuk receivables from Boyalik in a nonrecognition

[*28] transaction, Buyuk had to allocate--and did allocate--the recognized built-in loss to Boyalik.  See sec. 1.704-3(a)(8), (b)(1), Income Tax Regs.  Similarly, Beyzait had to and did allocate the built-in loss recognized from the disposition of the Beyazit receivables to RP Capital.  Id.

If a partner contributes property with inherent loss to a partnership and subsequently sells all or a portion of his or her partnership interest, the partnership must allocate any built-in loss recognized from the disposition of the property to the successor of the partnership interest in proportion to the partnership interest transferred.  Sec. 1.704-3(a)(7), Income Tax Regs.  Consistent with this allocation rule, Boyalik allocated 90% of the built-in loss flowing from Buyuk to Mr. Cochran, and RP Capital allocated 90% of the built-in loss from Beyazit to Mr. Perlman.

Respondent's Positions

Respondent does not dispute the manner in which the losses were allocated.  Instead, respondent attacks the entire series of transactions starting with Saratov's purported contribution of its receivables to EROSE.  Respondent advances several alternative arguments to support his disallowance of the claimed losses.  They

[*29] include:[11] (1) Saratov's contribution of the receivables to EROSE and EROSE's subsequent cash distributions to Saratov in redemption of its interest in EROSE constituted a disguised sale of the receivables under section 707(a)(2)(B); (2) Saratov's contribution of the receivables to EROSE and EROSE's subsequent sale of its interests in Boyalik and RP Capital to Messrs. Cochran and Perlman were in substance sales of the receivables to Messrs. Cochran and Perlman and prearranged steps designed to improperly shift tax losses to Messrs. Cochran and Perlman that should be collapsed under the step transaction doctrine; and (3) the transactions at issue lacked economic substance. On the record before us, we sustain respondent's disallowance of the claimed losses under all of the three alternative grounds.

Expert Reports

We admitted a total of five expert reports and one expert rebuttal report at trial, and the experts who wrote these reports testified and were cross-examined by opposing counsel. See Fed. R. Evid. 702; Rule 143(g). In one instance, we directed two adverse experts who offered diametrically opposing opinions on the

---

[11]Respondent has advanced a number of different arguments in support of the disallowance of the losses. Because we are able to reach our holding today solely on the basis of disguised sales, substance over form and step transaction, and the lack of economic substance, we express no opinions as to other theories respondent has argued on his brief.

**[*30]** same subject matter to testify concurrently in a manner described more fully below. Our discretion to accept or reject an expert's analysis in whole or in part is broad. Crimi v. Commissioner, T.C. Memo. 2013-51, 105 T.C.M. (CCH) 1330, 1340 (2013) (citing cases). "We need not accept an expert's opinion in its entirety, * * * and we are not bound by an expert's opinion that is contrary to our own judgment". Id. (citing Parker v. Commissioner, 86 T.C. 547, 562 (1986), and Chiu v. Commissioner, 84 T.C. 722, 734 (1985)). To the extent that in reaching our decisions today we have relied on an expert's opinions submitted to us, we will summarize those opinions below.

### Burd Report

We recognize Gene Burd as an expert in Russian law, specifically Russian currency control law, commercial aspects of the Russian civil law, Russian corporate law, and Russian business practices.

#### Currency Control System in Russia

The Russian Federation has had a very strict foreign currency control regime since the disintegration of the Soviet Union in 1991. In 1992 the Russian Government adopted the Currency Control Law of 1992 establishing the principles of the currency operation, authority and functions of the agencies of the

[*31] currency control, rights and obligations of the residents and nonresidents, and liability for violation of currency control legislation.

The 1992 law divided transactions into two types: foreign currency operations in the ordinary course of business and foreign currency operations involving transfer of capital. The 1992 law required all payments between residents and nonresidents to be made under the regulations established by the Central Bank of the Russian Federation (CBRF). All transactions in violation of the 1992 law were invalid and void.

The 1992 law also established "authorized banks" to act as the CBRF's agents in carrying out certain specific functions under the currency control regime. These authorized banks were responsible for monitoring and reviewing compliance with the currency control laws, reviewing the merits of foreign currency transactions, and supervising the correctness and completeness of accounting and reporting in connection with transactions involving foreign currency. The ultimate effect of the currency control regime was that no transaction involving foreign currency could be legally carried out outside of the regulatory supervision and control of the CBRF, its regional offices, or the authorized banks.

[*32] Mr. Burd opines that the transactions involving the Saratov receivables would be considered transactions in connection with the movement of capital subject to the restrictive currency control regime. These include Saratov's having a membership interest in EROSE, its redemption of its interest in EROSE, and its payments to a nonresident that Saratov was required to make under the collection agreement should it collect from the debtors. Thus, the contemplated transactions would require special permissions in accordance with procedures established by the CBRF, which included submission of a long list of documents and obtaining a positive opinion, i.e., approval, from the Ministry of Economy. Permissions were granted rarely and only on a discretionary basis.

Mr. Burd further opines that the collection agreement would be virtually impossible to implement given the onerous currency control restrictions. Under the collection agreement, Gramercy was required to open a bank account into which Saratov would deposit all collections on the receivables. Gramercy had two options to effect this scheme: (1) establishing a ruble-denominated bank account in Russia or (2) establishing an account in another currency outside Russia. To implement the first option, Gramercy would need to obtain special permission in accordance with Instruction 93-I dated October 12, 2000, On the Procedure for the Establishment by the Authorized Banks of the Bank Accounts for Non-Residents

**[*33]** in the Currency of Russian Federation and Execution of Transactions on These Accounts (Instruction 93-I). Gramercy would essentially need to open a branch office in Russia in order to meet the onerous filing requirements and administrative procedures for doing so. The entire process was time consuming and required assistance from local counsel to ensure compliance.

If Gramercy were to open an account outside Russia, the payment scheme contemplated by the collection agreement would require Saratov's amending its contracts with its debtors so that the debtors would transfer any payments directly to Gramercy's offshore account since intercompany payments in Russia were customarily made only by direct bank transfers. It would also require Saratov to issue notices to its debtors informing them of the change of ownership of the receivables. Finally, Saratov's debtors would also need to obtain special permissions before they could make any direct payments to an account established outside of Russia.

The record does not show any of these steps were taken.

### Statute of Limitation

Mr. Burd also questions whether Gramercy had sufficient information to confirm that the statutory period of limitation had not run on the receivables and that the receivables remained collectible. Mr. Burd has reviewed documents that

[*34] purported to substantiate the claim that the statutory period of limitation had not run on the assigned debts when Saratov purportedly transferred the accounts receivable to EROSE. Mr. Burd concludes that the documents would be insufficient to substantiate such a claim.

A general period of limitation under the Russian Civil Code is three years. The period begins to run when the creditor acquires the right to demand performance, upon the expiration of any extended time for performance, or upon the debtor's admission of indebtedness; admission of indebtedness during the statutory period would also restart the period of limitation. A reconciliation report may serve as evidence of an admission of indebtedness. Although account reconciliation reports were provided to substantiate the claim that the receivables remained collectible when Saratov transferred them to EROSE, these reports, in Mr. Burd's opinion, did not provide the required details as to when the purportedly admitted debts were incurred, when they were due, and whether the entire obligation or only a portion had been admitted by the debtors. Without the required information, the reconciliation reports were ineffective under the relevant Russian laws to restart the period of limitation.

**[*35]** <u>Barter Transactions</u>

During the mid-1990s when the Saratov receivables arose, there was a shortage of working capital in Russia, resulting in frequent failure of companies to meet their current obligations. Many private and state-owned enterprises did not have sufficient cash in hand to make timely payments for the most necessary equipment and supplies or to meet payroll obligations. Salary payments were often delayed for months, and sometimes employees would have to sell or exchange goods manufactured by their own companies, which had paid these employees in kind with the manufactured goods, to sustain their livelihood.

The financial situation facing the electric power industry was rather bleak. Average salary arrears reached as high as 6 months and in certain regions up to 8 to 12 months. In 1998 only about 20% of any outstanding obligations was met with cash payments and the rest was met with payments in kind and IOUs. Barter transactions were time consuming and inefficient and did not always result in actual cash collections. It was not unusual for parties to structure multiple transactions to obtain required goods or to convert products to cash. The prevalence of barter and debt settlement transactions resulted in the creation of unofficial exchange markets with traders and brokers who connected various deals.

**[*36]**        Devaluation of Russian Ruble

In 1998 the Russian ruble collapsed.  On August 17, 1998, the Russian Government devalued the ruble, defaulted on domestic debt, and declared a moratorium on payment to foreign creditors.  Within a month, the value of Russian rubles fell from approximately 6.7 rubles to U.S. dollar to 21 rubles per dollar.

Customary Business Practice Around 2002

By 2002 the fiscal situation facing the Russian electric power supply and distribution system improved significantly, and problems with nonpayment or bartering in place of cash payments had been practically eliminated.  However, legal and business due diligence remained a crucial part of engaging in any transactions with businesses in Russia.  In the light of complex currency control regulations, Western companies would conduct extensive due diligence before doing any business in Russia.  As a result, proper documentation of any transaction was crucial, and transaction documents were verified and reviewed in excruciating detail.  It would thus be highly unusual for there to be a complete absence of any pretransaction due diligence and failure to address basic requirements of the currency control regulations in documenting a particular transaction, as was the case with the Buyuk and Beyazit transactions.  Mr. Burd thus concludes that a Western business, like EROSE or Gramercy, would not

**[*37]** engage in a transaction in Russia with the expectation of profit without putting together a comprehensive document package that would be crucial in the eventual and successful repatriation of these profits from Russia.

Bean Report

We recognize Professor Bruce Bean as an expert in Russian business practices and business climate between March 1995 and June 2003.

Generally, Professor Bean and Mr. Burd agree on many points relating to the general environment in Russia in the 1990s . Their discussions of the economic environment in Russia, barter transactions, and customary business practices (e.g., the importance of extensive due diligence and documentation of any transaction) are largely consistent. They disagree primarily in their conclusions.

Professor Bean points out that Saratov had some leverage for collecting outstanding debts because its customers needed electricity. And since Saratov provided electricity to a region that was relatively prosperous and well endowed with oil and gas and productive agricultural land, Professor Bean opines--while acknowledging he has no knowledge about Saratov's business itself--that the Saratov receivables were an attractive investment especially in the light of the economic recovery and renewed optimism Russia experienced in the early 2000s.

**[*38]** Professor Bean then concludes the transactions at issue were consistent with for-profit business transactions and procedures entered into in Russia during the relevant period and that the documentation and procedures used in these transactions were consistent with the usual and customary business practices prevalent in Russia at that time.

While we find Professor Bean to be a credible expert witness, the conclusory nature of his opinions compels us to give them little weight in reaching our decision today. First, his conclusion that the Saratov receivables would make an attractive investment was speculative and vague. Professor Bean's report fails to discuss with any specificity or detail how the obligors of these receivables would be able to meet their obligations under the accounts. Professor Bean admits in his report that he has no information on Saratov's business and by extension its debtors; thus we question how Professor Bean was able to conclude the Saratov receivables would be a good investment without knowing anything about the specific debtors. Finally, relying generally on the upward outlook of an economy at the regional or national level is not, at least in these cases, sufficient to show for-profit motive when, as Mr. Burd and Scott Calahan point out, the countervailing factors would cause any prudent businessperson to pause before making the investment.

**[\*39]** Moreover, Professor Bean fails to identify in his report how the documents and procedures used in the transactions at issue, and which of these documents and procedures, were consistent with the usual and customary business practices in Russia at the time. Without any specifics, it is difficult for us to glean from Professor Bean's report what led him to his conclusion, especially when we consider both Mr. Burd's and Mr. Calahan's detailed discussions of the type of extensive due diligence and documentation required in a transaction similar those in these cases.

In sum, we give the Bean report little evidentiary weight.

<u>Concurrent Expert Witness Testimony--Mr. Burd and Professor Bean</u>

Following a pretrial conference and on the parties' agreement, the Court directed Mr. Burd and Professor Bean to testify concurrently. The procedure was implemented in substantially the same way as in <u>Rovakat, LLC v. Commissioner</u>, T.C. Memo. 2011-225, 102 T.C.M. (CCH) 264, 271 (2011), <u>aff'd</u>, ___ Fed. Appx. ___, 2013 WL 2948023 (3d Cir. June 17, 2013). <u>See also</u> <u>Crimi v. Commissioner</u>, 105 T.C. M. (CCH) at 1330. <u>See generally</u> Michael R. Devitt, "A Dip in the Hot Tub: Concurrent Evidence Techniques for Expert Witnesses in Tax Court Cases", 117 J. Tax'n 213 (2012) (discussing the concurrent testimony process more fully). Insofar as the conclusions reached in the Burd report and the Bean report are

**[\*40]** diametrically opposed to each other, we cannot overstate the importance of concurrent witness testimony in these cases. Moreover, through Mr. Burd's and Professor Bean's concurrent testimony, we were able to flesh out some of their reports' conclusions, reasonably reconcile the experts' varying conclusions when possible, and when reconciliation was impossible, understand the basis for their disagreeing opinions and decide which opinion to rely on.

Both Professor Bean and Mr. Burd agree that doing business in Russia would require extensive due diligence and strict compliance with documentation. Both experts further agree that several steps in the transactions, such as the payment mechanism under the collection agreement, would implicate the restrictive currency control laws.

Calahan Report

We recognize Scott Calahan as an expert in asset management, including the performance of due diligence and valuation of distressed debts.

Saratov Receivables and Due Diligence

The Calahan report's observations on the statute of limitation applicable to the receivables at issue, the Russian economy and commercial culture in the mid 1990s to early 2000s, and the type of due diligence an informed buyer would be expected to conduct in connection with similar transactions are consistent with

[*41] those in the Burd report and the Bean report.  We will highlight only several issues the Calahan report is able to supplement.

Mr. Calahan observes that there was an absence of any credit analysis or adequate due diligence and documentation of the debtors of the Saratov receivables.  He thus concludes Gramercy and EROSE had made "less than serious" efforts to understand Saratov's debtors and how to collect the receivables.  Mr. Calahan further opines this lackluster effort drastically reduced any ability to resell the Saratov receivables to an informed and independent buyer as well as any expected market price upon any resale.

The Calahan report lists over 50 due diligence items that an informed buyer would expect to review in a similar transaction.  However, only a handful of the due diligence items are found in the record.  Having reviewed petitioners' production during discovery and his own independent research, Mr. Calahan concludes that there remained the uncertainty, among other uncertainties, as to the existence of the companies identified as debtors and their ability to repay.  Mr. Calahan also questions whether the small expected return, if any, from the distressed receivables--assuming all the uncertainties were favorably resolved to the satisfaction of a fully capable U.S. investor--justified the work required and the cost to properly evaluate and document the acquisition of the distressed debts.

**[*42]** Mr. Calahan also notes that not all uncertainties were likely to be favorably resolved.

Finally, Mr. Calahan opines that the collection agreement was commercially unreasonable and would have likely inhibited any remittances to Gramercy. Mr. Calahan notes that collection agreements rarely have a deductible before payment of any servicing fee. Mr. Calahan opines that it would be unlikely for Saratov to be able to collect 10% or more of the Saratov receivables and that Saratov would not have expected to often be paid any servicing fee as a result of the 10% deductible in the collection agreement. Mr. Calahan further notes that Saratov's share of the upside on collection (i.e., 75% of any collection after the deductible) was unreasonable since servicing and collection fees rarely exceed 30% to 40% of monthly collections.

### Valuation of the Saratov Receivables

Mr. Calahan has also appraised the Saratov receivables. The Calahan report provides fair market values of the receivables on March 1, 2002 (i.e., around the time when Saratov transferred the receivables to EROSE), September 26, 2003 (i.e., when EROSE transferred the Buyuk receivables and Beyazit receivables to Boyalik and RP Capital, respectively), and October 13, 2003 (i.e., when Mr. Cochran and Mr. Perlman purchased from EROSE their member interests in

**[\*43]** Boyalit and RP Capital, respectively).   Mr. Calahan defines fair market value to be the price at which property would change hands between a willing U.S. buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.  For each of the three dates, Mr. Calahan provides valuations under two alternative assumptions:  (1) Saratov's transfer of the Saratov receivables was a valid and effective transfer and none of the uncertainties identified in the Calahan report existed; (2) the uncertainties identified in the report did exist and had not been resolved, that is, assuming the transaction as it actually existed.

In general, the longer the debtor has gone without paying down the debt, the lower the price buyers of that debt are willing to pay; obligations more than five years past due are generally regarded as having little to no value.  In appraising the Saratov receivables, Mr. Calahan used the income method of valuation and the market method of valuation; the valuation methods and the valuations themselves are unrebutted and were not challenged at trial.  Mr. Calahan then reconciled the results from these two approaches.  His reconciled values are approximately the midpoint between the income method and market method values, subject then to adjustment on the basis of his professional judgment. The following tables show the valuation results:

**[*44]** INCOME METHOD VALUATION

1.     Assuming all uncertainties resolved satisfactorily

| Debtor | 3/1/2002 | 9/26/2003 | 10/13/2003 |
|---|---|---|---|
| OAO Khimvolvokna | 0.79% | 0.29% | 0.28% |
| AOOT Yershovsky Kam | 0.39 | 0.16 | 0.15 |
| AO Orashayemoye | 0.60 | 0.23 | 0.22 |
| AOOT Saratovsky Kame | 0.79 | 0.29 | 0.28 |

2.     Assuming uncertainties not resolved

| Debtor | 3/1/2002 | 9/26/2003 | 10/13/2003 |
|---|---|---|---|
| OAO Khimvolvokna | 0.0% | 0.0% | 0.0% |
| AOOT Yershovsky Kam | 0.0 | 0.0 | 0.0 |
| AO Orashayemoye | 0.0 | 0.0 | 0.0 |
| AOOT Saratovsky Kame | 0.0 | 0.0 | 0.0 |

MARKET METHOD VALUATION

1.     Assuming all uncertainties resolved satisfactorily

| Debtor | 3/1/2002 | 9/26/2003 | 10/13/2003 |
|---|---|---|---|
| OAO Khimvolvokna | 0.44% | 0.15% | 0.14% |
| AOOT Yershovsky Kam | 0.22 | 0.07 | 0.07 |
| AO Orashayemoye | 0.34 | 0.11 | 0.11 |
| AOOT Saratovsky Kame | 0.44 | 0.15 | 0.15 |

**[*45]** 2.      Assuming uncertainties not resolved

| Debtor | 3/1/2002 | 9/26/2003 | 10/13/2003 |
|---|---|---|---|
| OAO Khimvolvokna | 0.0% | 0.0% | 0.0% |
| AOOT Yershovsky Kam | 0.0 | 0.0 | 0.0 |
| AO Orashayemoye | 0.0 | 0.0 | 0.0 |
| AOOT Saratovsky Kame | 0.0 | 0.0 | 0.0 |

RECONCILED VALUATION

1.      Assuming all uncertainties resolved satisfactorily

| Debtor | 3/1/2002 | 9/26/2003 | 10/13/2003 |
|---|---|---|---|
| OAO Khimvolvokna | 0.60% | 0.20% | 0.20% |
| AOOT Yershovsky Kam | 0.30 | 0.10 | 0.10 |
| AO Orashayemoye | 0.45 | 0.15 | 0.15 |
| AOOT Saratovsky Kame | 0.60 | 0.20 | 0.20 |

2.      Assuming uncertainties not resolved

| Debtor | 3/1/2002 | 9/26/2003 | 10/13/2003 |
|---|---|---|---|
| OAO Khimvolvokna | 0.0% | 0.0% | 0.0% |
| AOOT Yershovsky Kam | 0.0 | 0.0 | 0.0 |
| AO Orashayemoye | 0.0 | 0.0 | 0.0 |
| AOOT Saratovsky Kame | 0.0 | 0.0 | 0.0 |

**[*46]** <u>Cragg Report</u>

We recognize Michael Cragg as an expert in economics and finance, specifically economic and financial analysis of cross-border transactions and international capital markets.

Dr. Cragg first opines that the transactions at issue were outside the scope of Gramercy's normal business. As the record shows, before its dealings with BDO and in the Saratov receivables, Gramercy invested primarily in sovereign and corporate securities denominated in U.S. dollars that were issued on the international capital markets and subject to the laws of New York and the United Kingdom. In contrast, the Saratov receivables bore none of these earmarks of Gramercy's investment philosophy. Dr. Cragg finds the Saratov receivables were subject to unique risks, such as currency risk and Russian legal risk, that were outside of Gramercy's typical focus.

Dr. Cragg believes Gramercy's investment in the Saratov receivables failed to follow its core investment strategies that were event and value driven. In the context of distressed debt, an event-driven investment adviser would want to know whether the distressed debt could be either restructured or repaid leading to significant profits in the future. Event-driven strategy is highly sensitive to timing relative to market events. However, Gramercy appeared to allow BDO to dictate

**[*47]** when it had to sell the Saratov receivables as part of the BDO distressed debt structure, and the record does not otherwise show the decision to sell the receivables was prompted by any market events. A value-oriented strategy involves selecting assets that are undervalued from a fundamental, future cashflow perspective and require an analysis of the fundamental value of the assets. Dr. Cragg does not believe Gramercy performed such an analysis, and we note here Mr. Calahan's valuation of the receivables based on the income method reveals the receivables had little to no fundamental value.

Dr. Cragg further opines that no rational investor could have expected that collections would improve or produce a positive restructuring outcome as a result of the BDO distressed debt structure or the collection agreement. Dr. Cragg observes that credit restructuring normally involves active renegotiation to influence the way in which a debtor repays its obligations. This may involve liquidation of a debtor's assets, renegotiating the specific terms of a credit agreement, or influencing the credit collection process in other ways. However, by entering into the collection agreement with Saratov after acquiring the debts, Gramercy did nothing to further influence the collection process but instead passed the role of the collector back to Saratov, which had already demonstrated its inability to collect on the receivables throughout their lives; some of them had

[*48] been incurred as early as 1997. Indeed, the Calahan report and the Cragg report are in agreement in that Saratov had little to no economic incentive to pursue the debtors and collect on the receivables as a result of the 10% deductible in the collection agreement. The record bolsters Dr. Cragg's conclusion since there is no evidence of any collections on or attempts to restructure the Saratov receivables.

Dr. Cragg finally opines that no economically rational taxpayer would have entered into the overall transactions involving the BDO distressed debt structure at issue but for the tax benefits arising from the transactions. Dr. Cragg finds it highly improbable that the substantial costs of the transactions could be overcome by a combination of a large increase in the value of the ruble along with a massive improvement in collections on the Buyuk receivables or the Beyazit receivables. On the other hand, the anticipated magnitude of the claimed tax benefits guaranteed the Buyuk transaction and the Beyazit transaction would be individually profitable if those tax benefits were realized even if the values of the receivables dropped to zero. In other words, on an after-tax basis, substantial profits were guaranteed while on a pretax basis losses were virtually certain.

At the time of the sales of the Buyuk receivables and the Beyazit receivables, those receivables had face values of $937,884 and $2,552,207,

[*49] respectively. Gramercy valued these two sets of receivables at $67,319 (Buyuk receivables) and $186,220 (Beyazit receivables) as of October 13, 2003 (i.e., approximately one to two months before the sales of the receivables); Gramercy determined both values by applying the same predetermined percentage, i.e., 7.38%. Taking into account petitioners' limited upside potential under the collection agreement (i.e., at the most 32.5% of the collections) and Gramercy's performance fee--assuming full collections on the receivables in a short time and using the highest RUB/USD exchange rate between the exchange rate on October 13, 2003 and the exchange rate on December 26, 2003--the maximum values the Buyuk receivables and the Beyazit receivables could achieve were $257,313 and $700,818, respectively.

On the other hand, the transaction costs in connection with the Buyuk transaction and the Beyazit transaction were $295,579 and $767,576, respectively, broken down as follows:

[*50] <u>Buyuk transaction</u>

| Payee | Type | Amount |
|---|---|---|
| EROSE | Interest in Boyalik | $60,579 |
| BDO | Consulting fee | 200,000 |
| BDO | Tax representation fee | 5,000 |
| Register & Akers | Report on Gramercy | 5,000 |
| Kilpatrick Stockton | Legal opinion | 25,000 |
| Total | | [1]295,579 |

[1]The total transaction cost Dr. Cragg used in his report was $290,579. We do not see how the lower transaction cost could have materially affected Dr. Cragg's eventual opinion.

<u>Beyazit transaction</u>

| Payee | Type | Amount |
|---|---|---|
| EROSE | Interest in Boyalik | $167,576 |
| BDO | Consulting fee | 500,000 |
| BDO | Tax representation fee | 20,000 |
| Register & Akers | Report on Gramercy | 5,000 |
| Kilpatrick Stockton | Legal opinion | 75,000 |
| Total | | [1]767,576 |

[1]The transaction cost Dr. Cragg used in his report was $787,576. Dr. Cragg testified that the actual transaction cost being lower did not materially affect his conclusion. We agree.

In addition, Mr. Cochran and Mr. Perlman each incurred an additional 2% asset

management fee that they would not have incurred but for the BDO distressed debt

**[*51]** structure. Dr. Cragg thus opines that without the anticipated tax benefits, it was virtually impossible for the transactions to break even, even if in the extremely unlikely event <u>all</u> of the Buyuk receivables or Beyazit receivables, as the case may be, were fully collected. In contrast, the after-tax profits were guaranteed. In conclusion, Dr. Cragg finds that a rational investor could not have reasonably expected to make a nontax profit from either the Buyuk transaction or the Beyazit transaction given the required increase in receivable recovery rates and the required large appreciation in the ruble.

Figure 1 below shows a combination of collection rates and exchange rates that was necessary for the transactions to be profitable on a pretax basis.

**[\*52]**



Figure 1

Spirikhin Report

We recognize Alexei Spirikhin as an expert in Russian Accounting generally and specifically in reviewing and analyzing Russian financial statements.

**[\*53]** Mr. Spirikhin reviewed and analyzed Saratov's financial statements for the years ending December 31, 2001 and 2002. He concludes the financial statements were prepared in accordance with Russian accounting laws and Russian Accounting Standards that all Russian companies were required to follow in preparing financial statements. Under Russian accounting principles, Saratov had to reflect on its financial statements ownership in all domestic and foreign entities irrespective of the size of the investment. For 2002 Saratov did not report any change to its long-term financial investments, including investments in subsidiaries, affiliates or associate companies, and other organizations. On the basis of this observation, Mr. Spirikhin opines that Saratov did not make any capital investments to any overseas subsidiary, or more specifically, Saratov did not establish EROSE as a subsidiary or invest in it. Mr. Spirikhin further opined at trial that the financial statements do not reveal any evidence of any return on an investment, including Saratov's receiving a distribution in redemption of any purported interest in EROSE, which would have been reported on Saratov's financial statements had it actually occurred.

Further, the Khimvolokna receivables were specifically listed in the 2002 financial statements as one of the major debtors. However, the Khimvolokna receivables were not similarly listed in the financial statements for the year ending

[*54] December 31, 2003. Mr. Spirikhin also notes that in 2003 there was a sizable bad debt writeoff but is uncertain as to whether the Saratov receivables were among the debts that were written off. Mr. Spirikhin opines that one possibility was that Saratov sold the receivables for less than their face value in 2003 and wrote off the losses then.

Mr. Spirikhin also reviewed at trial Saratov's account reconciliation reports dated December 1, 2002, for Khimvolokna, Orashayemoye, and Yershovsky Kam, which are in evidence. These reports are not invoices, but they are essential to the preparation of a company's financial statements in that they represent the amounts the creditor and the debtor believe to be outstanding at a given time. On the account reconciliation reports dated December 1, 2002, Saratov recorded outstanding receivables due from Khimvolokna, Orashayemoye, and Yershovsky Kam in amounts equal to or greater than the amounts purportedly transferred to EROSE. On the basis of these observations, Mr. Spirikhin opines that Saratov would not have created these reports if it had transferred the receivables to EROSE and thus appeared to own the receivables at the end of 2002.

Finally, we note that Professor Bean opined during the course of his concurrent testimony that it was possible that Saratov believed it still owned the receivables in 2002 and kept them on its books despite having transferred them to

[*55] another entity for an interest in that entity. Professor Bean speculated that Saratov might think that because nobody knew about the transaction, it wanted to wait and see whether the transaction would actually succeed before reporting the transaction on its financial statements.

Disallowance of the Claimed Loss Deductions

Disguised Sales Under Section 707(a)(2)(B)

Generally, a partner may contribute property to a partnership for an interest in the partnership tax free. Sec. 721(a). Likewise, a partner may receive tax-free distributions from the partnership of previously taxed capital. Sec. 731(a). However, the disguised sales rule under section 707(a)(2)(B) treats a contribution of property and a related distribution from the partnership as a taxable sale when their combined effect is to allow the contributing partner to dispose of the contributed property for money or other consideration. See sec. 1.707-3(a)(1), Income Tax Regs. This is the case when the distribution would not have been made but for the initial contribution of property and, in cases involving nonsimultaneous transfers, the distribution is not dependent on the entrepreneurial risks of partnership operations. Sec. 1.707-3(b)(1), Income Tax Regs. In other words, with nonsimultaneous transfers, if the contributing partner's capital is at risk in the partnership for a sufficient time, the nonrecognition rules apply.

[*56] Conversely, if contributed capital is not at risk and the subsequent distribution bears no relationship to the entrepreneurial risks of the partnership's operations, the transfers are properly viewed together as a sale.

Transfers treated as sales under the disguised sales rule are treated as sales for all purposes under the Code. Sec. 1.707-3(a)(2), Income Tax Regs. The sale is considered to take place on the date the partnership is considered the owner of the property under general principles of Federal tax law. Id. For nonsimultaneous transfers, the contributing partner is deemed to have exchanged the contributed property for the partnership's obligation to make a subsequent transfer or transfers of money or other consideration. Id. See generally secs. 453 (installment sale), 1274 (time value of money rules); sec. 1.707-3(f), Example (2), Income Tax Regs.[12]

Under the regulations, reciprocal transfers between the partner and the partnership made within two years give rise to a rebuttable presumption that the transfers constitute a sale of the transferred property to the partnership. Sec. 1.707-3(c), Income Tax Regs. The taxpayer may rebut the presumption by carrying his or her burden to show facts and circumstances that "clearly establish

_____

[12]We fully expect the parties to apply during Rule 155 computations the rules of installment sales under sec. 453 and time value of money under sec. 1274 as is the case in the example in the regulations.

**[*57]** that the transfers do not constitute a sale." Id. (emphasis added); see

Superior Trading, LLC v. Commissioner, T.C. Memo. 2012-110, 103 T.C.M.

(CCH) 1604, 1613 (2012), aff'd, 728 F.3d 676 (7th Cir. 2013). The regulations

further provide 10 such facts and circumstances that may tend to prove the

existence of a sale. Sec. 1.707-3(b)(2), Income Tax Regs.

In 2002 and 2003, following Saratov's transfer of the Saratov receivables to

EROSE, Saratov received cash distributions from EROSE of at least $3.5 million,

or approximately 90% of the Saratov receivables' value determined on the date the

receivables were transferred to EROSE (i.e., March 1, 2002). Following Mr.

Cochran's and Mr. Perlman's purchases of EROSE's interests in Boyalik and RP

Capital, respectively, in October 2003, EROSE made cash distributions to Saratov

of $1,594,021 in December 2003.[13] Hence, under the disguised sales regulations,

the presumption of a sale attaches. Unless petitioners can clearly establish the

transfers were not in fact sales of the receivables, EROSE is considered to have

bought the Buyuk and Beyazit receivables from Saratov and taken cost bases in

---

[13]The cash distributions were partly funded by Mr. Cochran's and Mr. Perlman's payments for their purchases of EROSE's interests in the LLCs since there is nothing in the record showing EROSE had other cash income to otherwise enable the cash distributions.

**[*58]** them of $44,329 and $124,577, respectively, subject to any adjustments under sections 453 and 1274.[14]

The record in these cases also compels the conclusion that the transfers are properly characterized as a sale under the disguised sales regulations. First, it is clear that EROSE's cash distributions to Saratov would not have been made but for Saratov's transfer of the receivables. See sec. 1.707-3(b)(1)(i), Income Tax Regs. Indeed, the cash distributions were entirely funded by money provided by individuals such as Messrs. Cochran and Perlman who would not have bought into the LLCs but for the receivables' having the desired characteristics and tax attributes. What is more, Saratov was initially concerned about the BDO distressed debt structure but eventually agreed to participate in it after being assured that it would receive cash for the receivables sometime after the initial

_____

[14]These were the amounts EROSE had agreed to pay and paid Saratov for the receivables. Respondent appears to claim that EROSE took cost bases in the receivables equal to what Messrs. Cochran and Perlman each paid for their interests in Boyalik and RP Capital, respectively. But because the partnership is considered the purchaser of the Saratov receivables under the disguised sales rule, the reference point is what EROSE paid. In essence, and putting aside any currency fluctuations between March 2002 and October 2003, Messrs. Cochran and Perlman paid EROSE more than what EROSE paid Saratov for the Buyuk and Beyazit receivables -- i.e., EROSE charged Messrs. Cochran and Perlman for the receivables at 7.38% of the face amount while paid Saratov only 5%--and EROSE pocketed the difference. But this does not change the fact that EROSE's tax bases must be its costs. We expect that during Rule 155 computations, these lower bases will result in higher gains from the sales of the receivables to GFS.

[*59] contribution. In other words, the contribution of the receivables and the subsequent cash distributions were reciprocal transfers.

Further, the record shows the Saratov receivables were not at risk in EROSE's hands and EROSE's cash transfers to Saratov bore no relationship to the entrepreneurial risks of the partnership's operations. See sec. 1.707-3(b)(1)(ii), Income Tax Regs. Petitioners argue that without Saratov and Gramercy's joint efforts to operate EROSE in a manner to monetize the receivables, there would have been no cash available for distributions. As petitioners see it, there were three ways for the so-called joint efforts to make a profit on the receivables: (1) collecting on the receivables; (2) restructuring the receivables for a more favorable collection outcome; and (3) selling the receivables to someone else. However, under the BDO distressed debt structure, the Saratov-Gramercy "partnership" could not have monetized the receivables in any of these three ways.

Soon after Saratov transferred the receivables to EROSE, Gramercy, as EROSE's manager, outsourced the task of collection back to Saratov and did nothing else to collect on the receivables or influence their collection. Before entering into the collection agreement, Saratov had never been able to collect from its debtors. And the arrangement under the collection agreement did nothing to incentivize Saratov to "work harder" to pursue its debtors. To the contrary, the

**[\*60]** economic arrangement contemplated by the overall structure ensured that Saratov would receive less than what it could collect, if anything, on the receivables. If Saratov could successfully pursue its debtors to collect anything without Gramercy's assistance, Saratov, from an economic perspective, would not have entered into the arrangement and agreed to turn over a part of its collection to Gramercy, which offered no help at all. But because Saratov did join with Gramercy in EROSE while retaining its role as the sole collector pursuing the receivables, the parties could not have legitimately anticipated that Saratov and by extension EROSE would collect even one ruble from the debtors.

Indeed, other aspects of the record also support our finding that neither Saratov nor Gramercy expected successful collection. Gramercy's lackluster efforts to document and perform due diligence on the debtors and the collectibility of the receivables show Gramercy was never serious about collecting. Further, there is no credible evidence that indicates either Saratov or Gramercy attempted to comply or documented its compliance with the stringent foreign currency control regime in Russia. The payment scheme under the collection agreement likewise made any transfer of funds to EROSE virtually impossible without overcoming a plethora of regulatory hurdles in Russia. In addition, Mr. Calahan's unrefuted valuation of the receivables shows they had little to no value. When

[*61] viewed in the light of Mr. Calahan's valuation, the 10% deductible imposed by the  collection agreement eliminated any incentives for Saratov to pursue its debtors.[15]  Finally, no collection was ever in fact made.  Together, the record shows Saratov did not join Gramercy to operate EROSE to collect on the receivables.  Thus, any subsequent cash distribution by EROSE cannot be said to depend on the entrepreneurial risks of the partnership's operations in the context of collection.

The above analysis also informs our next finding, that Saratov and Gramercy likewise did not expect that their "joint efforts" could effect favorable restructuring outcomes for the receivables.  We first note that Mr. Calahan's valuation of the receivables as nearly worthless makes incredible any claim that it was realistically possible to restructure the debts.  Further, as Dr. Cragg points out in his report, debt restructuring requires active renegotiation to influence how the debtor may repay its debts:  for example, an increased interest rate in exchange for a longer term of repayment coupled with reduced periodic payments, immediate payment in satisfaction of the debt in exchange for substantial discount of the

[15]Even the 7.38% valuation agreed upon by Saratov and Gramercy strongly suggests that the parties did not believe any collection was likely to surpass the 10% threshold.  Thus, we agree with Mr. Calahan and Dr. Cragg that Saratov had no economic incentive to spend any efforts to collect on the receivables.

[*62] debt's balance, or threats of liquidation of debtor's assets in foreclosure, and so forth.

In most cases, the level of pressure and influence the collector may bring to bear is critical. But here Saratov continued to be the sole collector and had shown that it could exert little influence on its debtors. Meanwhile, Gramercy did not use any specialized skills, particular expertise, or commercial or political leverage to pressure the obligors of the receivables to renegotiate the debts for a more positive collection outcome. In fact, any skills or expertise Gramercy might have had in restructuring distressed securities related to restructuring sovereign or corporate debts, not consumer receivables that lacked the kinds of socioeconomic and commercial characteristics inherent in sovereign or corporate debts that lent themselves to restructuring.

Had Saratov been able to restructure the receivables with its debtors without Gramercy's help, it would have been unnecessary for Saratov to enter into the type of arrangement that it did with Gramercy. But the fact that Saratov did enter into such an arrangement suggests that neither Saratov nor Gramercy anticipated any successful restructuring would result from joining together under EROSE. Thus, in the context of restructuring, EROSE's cash distributions to Saratov had nothing

[*63] to do with the entrepreneurial risks of the partnership's operations since the partnership never endeavored to restructure the receivables in the first place.

Petitioners' claim that EROSE could monetize the receivables by operating to sell the receivables to someone else is likewise not supported by the record. It is true that EROSE turned the receivables into cash by contributing the receivables to a lower tiered LLC and then selling its interest in the LLC to tax-sensitive individuals like Messrs. Cochran and Perlman. However, it was not EROSE's ingenuity or Gramercy's entrepreneurial acumen that identified the individual purchasers and facilitated the sales. In fact, it had always been part of the integral plan, even before Saratov transferred its receivables to EROSE, that BDO would be responsible for identifying prospective purchasers and referring them to Gramercy; Gramercy's sole role was sourcing distressed foreign accounts receivable that met BDO's criteria and becoming a "partner" of the LLC to facilitate the implementation of BDO's scheme. EROSE and Gramercy simply had nothing to do with finding buyers of membership interests in LLCs that held Saratov's receivables. It is thus clear that BDO was the one that pledged the funding of the cash distributions to Saratov by promising to find individuals like Messrs. Cochran and Perlman to buy into the BDO distressed debt structure.

**[*64]** Simply put, Saratov's receipt of cash distributions from EROSE was not dependent on any entrepreneurial risks of EROSE's operations.

Further, the money Saratov received from EROSE had never been subject to any entrepreneurial risks of EROSE's operations because BDO and Gramercy had already agreed before the transfer of the Saratov receivables to pay Saratov about 5% of the face amount of any receivables that BDO was able to sell through the structure. Upon the transfer of the Saratov receivables, Saratov and Gramercy agreed Saratov's interest in EROSE had a value of approximately $3.9 million. As part of the BDO distressed debt structure, EROSE consistently sold to an individual or a group of individuals 90% of its interest in an LLC that held some portion of the Saratov receivables. Thus, in the aggregate, EROSE sold its membership interests in all of the LLCs involved for approximately $3.5 million ($3.9 million × 90%), which also equaled 5% of the face amount of the Saratov receivables using the exchange rate on March 1, 2002.[16] EROSE in fact made cash payments of approximately $3.5 million to Saratov within two years. With respect to each bundle of receivables, Mr. Cochran's account statement shows that

---

[16]RUB 2,195,102,103 divided by 31.027 multiplied by 5% = $3.53 million.

[*65] $44,329, or 5% of the Buyuk receivables' face amount,[17] was expected to be paid to Saratov in connection with the Buyuk receivables. Similarly, Gramercy's internal accounting spreadsheet shows that $124,577, or 5% of the Beyazit receivables' face amount,[18] was expected to be paid to Saratov in connection with the Beyazit receivables. Mr. Cochran's and Mr. Perlman's cash payments were each sufficient to cover the promised payments to Saratov, and EROSE paid Saratov the agreed amounts. When viewing all these pieces together, we are convinced that the money Saratov received was a fixed price negotiated between the parties before Saratov allegedly transferred the accounts receivable to EROSE, and the cash payments were thus not subject to any entrepreneurial risks of EROSE's partnership operations.

Finally, Saratov's economic position did not change and thus Saratov did not bear any risk by transferring the receivables to EROSE. Because the receivables were almost worthless, Saratov did not actually face any risks by placing them with EROSE--the worst that could have happened was the highly

---

[17]The face amount of the Buyuk receivables was RUB 27,491,732. Converted to U.S. dollars using the RUB/USD exchange rate of 31.027 on March 1, 2002, the face amount was $886,058.

[18]The face amounts of the Beyazit receivables was RUB 76,050,650. Converted to U.S. dollars using the RUB/USD exchange rate of 31.027, it was $2,451,111.

[*66] unlikely event that BDO would fail to find buyers and Saratov would be left with an interest in an LLC holding receivables that had always been worthless. Moreover, relying on Mr. Spirikhin's expert opinion and Mr. Bean's testimony, we believe that from Saratov's accounting perspective, it did not actually give up the receivables until it received cash from EROSE in 2003. This would explain why the receivables appeared to remain on Saratov's books for 2002.

All in all, we find that the cash payments to Saratov did not result from EROSE's operations. We further find there was little risk that Saratov would not receive the promised cash payments because BDO had assured Saratov that it would make cash payments equal to 5% of the receivables' face amount, which it would fund using payments from individuals who agreed to participate in its tax sheltering scheme. The assurance was virtually certain to materialize because the potential after-tax profits the structure was expected to generate far exceeded what BDO promised to pay Saratov, making it highly unlikely that BDO would fail in finding tax-motivated investors.[19]

---

[19]For Mr. Cochran, the expected return, in the form of an ordinary tax loss of approximately $4 million, on his cash investment of $600,000 under his IMA was 666%. For Mr. Perlman, the expected return ($10.99 million) on his cash investment ($1.65 million) was also 666%. This clever and yet contrived arithmetic, once unmasked, reveals the intent of BDO's scheme to lure its investors with and only with lucrative tax losses.

**[\*67]** Against the two-year presumption and the overwhelming evidence showing that the cash payments to Saratov were not dependent on the entrepreneurial risks of partnership operations, petitioners seek to rebut the presumption and persuade us the transfers were not a sale by attempting to show that the 10 facts and circumstances listed in the regulations were clearly absent in these cases.[20] See, e.g., sec. 1.707-3(f), Example (3)(iii), Income Tax Regs. (lack of sources to fund distribution may be evidence of transfer not part of sale). Petitioners rely heavily on the fact that Saratov did not have any legally enforceable right to a subsequent distribution when it transferred the receivables, see sec. 1.707-3(b)(2)(ii), Income Tax Regs., and that no one at that time was obligated to contribute cash or liquid

---

[20]The regulations state that the listed 10 facts and circumstances "may tend to prove the existence of a sale" but are otherwise silent on whether the converse is true--namely, whether their absence may prove that reciprocal transfers are not part of a sale. See sec. 1.707-3(b)(2), Income Tax Regs. Some commentators have suggested that Example 3 in the regulations appears to indicate that a taxpayer may rely on the absence of these factors to show a sale has not occurred. See Laura E. Cunningham & Noël B. Cunningham, The Logic of Subchapter K: A Conceptual Guide to the Taxation of Partnerships, 232 (4th ed. 2011); 2 William S. McKee et al., Federal Taxation of Partnerships and Partners, para. 14.02[3][b], at 19 (4th ed. 2007). This is the argument petitioners make in their brief. Because we disagree with petitioners' factual allegation underlying their argument (i.e., there is clearly an absence of any of the 10 factors from the transactions at issue), we need not address the premise of their argument (i.e., a showing of the absence of any of the 10 factors may tend to prove that related transfers are not part of a sale).

**[\*68]** assets to effect any subsequent cash contribution, see sec. 1.707-3(b)(2)(iv), Income Tax Regs.

But the crucial and common theme to be gleaned from the 10 facts and circumstances in the regulations and their examples is that if, at the time of the earlier transfer, it was reasonably certain that the transferor would receive cash or other consideration for the property transferred of an amount determinable with reasonably certainty, the related transfers will be reclassified as a sale. See sec. 1.707-3(b)(2)(i), Income Tax Regs. Our findings today show that Saratov was promised payments equal to 5% of the face amount of the Saratov receivables-- which were nearly worthless at the time of the transfer--upon BDO's successfully finding investors to pay for the receivables to be used in the structure. Neither Saratov nor BDO showed any doubt that BDO could find such investors, especially when we consider the fact that Saratov wanted only cash for the receivables and was willing to part with the receivables for the time being without being paid at once after BDO provided assurances that it could obtain the cash to fund the promised distributions. The assurances were backed and secured by the reasonable certainty that BDO would be able to raise $3.5 million with little difficulty in a short time from investors who hoped to avail themselves of tens of millions of dollars of tax losses through BDO's structure. Thus, we cannot agree

[*69] with petitioners that the facts and circumstances in these cases clearly establish the transfers were not a sale.

In sum, we conclude that Saratov's transfer of the Saratov receivables to EROSE and EROSE's cash payments constituted an installment sale of the receivables.[21]  As a result, EROSE's bases in the Buyuk and Beyazit receivables were cost bases to be computed under Rule 155.  See supra note 12.

Substance Over Form; Step Transaction

Our disguised sales analysis naturally suggests the possible application of the substance over form and step transaction doctrines.  "To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."  Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945).  For the reasons outlined in our disguised sales analysis, the true substance of the overall transaction was Saratov's disposing of the Saratov receivables for cash consideration.  When negotiating with Saratov, Mr. Helie understood that Saratov was ultimately interested in cash for its receivables.  The amount of cash Saratov

_____

[21]In reaching our decision today by recharacterizing the purported contribution and distributions as a sale in disguise, we do not intend to say one way or another whether EROSE was a bona fide partnership for Federal income tax purposes.

**[\*70]** would receive was already determined at the time of the initial transfer. It was virtually certain from the outset that BDO would be able to collect sufficient money from buyers interested in the tax attributes of the receivables to fund the promised consideration to Saratov. Thus, the overall transaction was in substance an installment sale of the receivables.

Under the step transaction doctrine, we may collapse a series of formal steps into a single transaction if: "the intervening steps are so interdependent that the legal relations created by one step would have been fruitless without completion of the later series of steps" (interdependence test), Superior Trading, LLC v. Commissioner, 137 T.C. 70, 90 (2011) (citing Penrod v. Commissioner, 88 T.C. 1415, 1428-1430 (1987)), aff'd, 728 F.3d 676 (7th Cir. 2013); "the formally separate steps are prearranged components of a composite transaction intended from the outset to arrive at a specific end result" (end result test), id. at 89 (citing True v. United States, 190 F.3d 1165, 1175 (10th Cir. 1999)); or "at the time of taking the first step, there was a binding commitment to undertake the subsequent steps" (binding commitment test), id. at 88-89 (citing Commissioner v. Gordon, 391 U.S. 83, 96 (1968)).

The end result test clearly applies here because everyone involved in the transaction had always expected from the outset of the transaction that Saratov

**[*71]** would be paid a predetermined amount once BDO was able to find individuals like Messrs. Cochran and Perlman to participate in its distressed debt structure. Our disguised sales analysis supports this conclusion. Indeed, the record shows many of the steps taken in the overall transaction were steps that the BDO distressed debt structure deliberately choreographed to produce the promised tax losses. See Superior Trading, LLC v. Commissioner, 137 T.C. at 90.

The interdependence test is equally applicable here. In applying this test, we inquire whether the intermediate steps accomplished valid and independent economic or business purposes. Id. Petitioners would want us to believe that each intermediate step had its own economic significance and served valid business purposes. The record, however, simply does not support such a claim.

Saratov's placing the receivables with EROSE served only one purpose: to facilitate the BDO distressed debt structure in exchange for a predetermined amount of cash. Saratov did not bear any risks when it transferred the receivables to EROSE because they were almost worthless.

As to Messrs. Cochran and Perlman, if their goal was to invest in foreign distressed debts, they could have purchased the debts directly. Messrs. Cochran and Perlman claim they wanted to avail themselves of the liability protection provided by an LLC because they were concerned about exposure to some

[*72] unspecified risks resulting from their investment in the Russian receivables. However, they have failed to articulate with particularity the risks to which they feared they would be exposed. Further, they could enjoy liability protection by either transferring any distressed debts that they acquired individually to an LLC or forming a single-member LLC for purposes of acquiring distressed debts--in either case, BDO's highly structured scheme involving multitiered partnerships would not be necessary to achieve the purported business purpose and bore no independent economic significance.

Finally, the only purpose for the eventual sales of the Buyuk and Beyazit receivables to GFS was to trigger the inherent tax losses rather than for any economic gain because the sales made at BDO's direction were simply a shuffling of the distressed receivables among the accounts Gramercy managed for other individuals. Put another way, the sales made no economic sense because, depending on the investment manager's outlook, he or she would inevitably undermine and harm the position of either the buyer or the seller, both of whom were his/her clients.

For these reasons, we can easily conclude that the various intermediate steps engineered for the BDO distressed debt structure are properly collapsed into a

**[\*73]** single transaction.[22] The transaction is simply Saratov's sale of the receivables to EROSE for a portion of what EROSE was then able to package as membership interests in certain LLCs and to resell to Messrs. Cochran and Perlman.

Economic Substance

As we have indicated earlier, the overall transaction engendered by the BDO distressed debt structure also lacked economic substance. Although taxpayers may generally structure their business transactions in a manner to maximize their after-tax profits (i.e., producing the least amount of tax liability), see Boulware v. United States, 552 U.S. 421, 430 n.7 (2008) (citing Gregory v. Helvering, 293 U.S. 465, 469 (1935)), courts may nonetheless disregard transactions that as a whole do not have economic substance compelled by business realities and separate and apart from the resulting tax benefits, Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978); Gilman v. Commissioner, 933 F.2d 143, 148-149 (2d Cir. 1991), aff'g T.C. Memo. 1989-684; see also ACM P'ship v. Commissioner, T.C. Memo. 1997-115, 73 T.C.M. (CCH) 2189, 2214-2215 (1997), aff'd in part, rev'd in part on other grounds, 157

---

[22] As to the binding commitment test, we find it inapplicable here because there was no express binding commitment to undertake the various transactions in the overall structure.

[*74] F.3d 231 (3d Cir. 1998).  The economic substance doctrine requires a searching analysis that turns on the "'objective economic substance of the transactions'" and the "'subjective business motivation'" behind them.  ACM P'ship v. Commissioner, 157 F.3d 231 at 247 (quoting Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), aff'g T.C. Memo. 1987-628, and aff'g Moore v. Commissioner, T.C. Memo. 1987-626, and aff'g Sturm v. Commissioner, T.C. Memo. 1987-625, and aff'g in part, rev'g in part Larsen v. Commissioner, 89 T.C. 1229 (1987)); Nicole Rose Corp. v. Commissioner, 117 T.C. 328, 336 (2001), aff'd, 320 F.3d 282 (2d Cir. 2003); see also Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91 (4th Cir. 1985), aff'g in part, rev'g in part 81 T.C. 184 (1983).

The various Courts of Appeals disagree as to the appropriate relationship between the objective and subjective prongs of the economic substance inquiry. See John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. ___, ___ (slip op. at 91) (Aug. 5, 2013) (citing cases from different circuits taking different approaches to objective and subjective tests).  Cases from the Court of Appeals for the Second Circuit, to which these cases are appealable,[23] can be construed as

---

[23]At trial, the parties stipulated that these cases are appealable to the Court of Appeals for the Second Circuit.

**[*75]** applying the two tests disjunctively, conjunctively, or according to the facts and circumstances without adhering to a rigid two-step analysis.  See generally United States v. Coplan, 703 F.3d 46, 91-92 (2d Cir. 2012) (noting that issue of how to apply two tests is not settled in the circuit).  But it appears courts in the Second Circuit tend to apply a flexible and fluid approach.  See Altria Grp., Inc. v. United States, 694 F. Supp. 2d 259, 282 (S.D.N.Y. 2010); Long Term Capital Holdings v. United States, 330 F. Supp. 2d 122 (D. Conn. 2004), aff'd, 150 Fed. Appx. 40 (2d Cir. 2005); see also Gilman v. Commissioner, 933 F.2d 143.  Irrespective of how the Court of Appeals treats the relationship between the two tests, our fluid and unitary analysis of the two prongs shows no economic substance in the transactions at issue because petitioners have failed to establish with credible evidence that there was ever any realistic possibility of making a pretax profit on the Buyuk and Beyazit receivables or that they had any valid business purpose other than acquiring the large tax benefits by entering into the transactions.  Consequently, we must disregard the transactions for Federal income tax purposes and sustain respondent's disallowance of the losses claimed.

## Objective Test

A transaction generally has economic substance for Federal income tax purposes if the transaction offers a reasonable opportunity for pretax profit.

[*76] <u>Gilman v. Commissioner</u>, T.C. Memo. 1989-684 (1989), 58 T.C.M. (CCH) 1075, 1080 (1989), <u>aff'd</u>, 933 F.2d 143 (2d Cir. 1991); <u>Rovakat, LLC v. Commissioner</u>, 102 T.C.M. (CCH) at 273 (citing <u>Gefen v. Commissioner</u>, 87 T.C. 1471, 1490 (1986)).  A reasonable opportunity for pretax profit is present only if there was a legitimate expectation that the nontax benefits would be at least commensurate with the transaction costs.  <u>ACM P'ship v. Commissioner</u>, 73 T.C.M. (CCH) at 2217.  In some instances, tax losses that do not "correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible" for Federal tax purposes.  <u>ACM P'ship v. Commissioner</u>, 157 F.3d at 252.

We agree with Dr. Cragg's conclusion that there was no realistic possibility for the transactions at issue to break even absent any tax benefits.  Dr. Cragg found the Buyuk and Beyazit receivables to have maximum values of $257,313 and $700,818, respectively.  However, the transaction costs associated with the Buyuk and Beyazit transactions were $295,579 and $767,576, respectively, without including the 2% asset management fees Gramercy charged in connection with the BDO distressed debt structure.  Thus, it was virtually impossible for the transactions to turn a profit even in the highly unlikely event the parties could collect the full face amounts of the receivables.

**[*77]** Gramercy valued the receivables at 7.38% of their face amount.[24] Thus, this valuation implicitly acknowledged that either collection within a short time beyond 7.38% was unrealistic and in fact impossible or collection beyond 7.38% was possible but costs associated with collection would yield a net value not much more than 7.38% of the receivables' face amount. In either case, the parties could not have contemplated that collection would yield a net value much more than 7.38%. And as we discussed above, the manner in which the collection agreement was structured provided no incentive for Saratov to expend any efforts to collect on the receivables. Thus, substantial favorable movement in the RUB/USD exchange rate was necessary to make up any shortfall in their values resulting from uncollectibility. Figure 1 shows the combination of short-term collection rates and exchange rate movement necessary to break even in the transactions. Over a long period, however, the minimum required collection rates would likely have to be even higher as a result of increased transaction costs associated with the time value of money and the market cost of risk.[25]

---

[24]Mr. Calahan's unrefuted valuations are much lower.

[25]But absent any extraordinary events, the actual collectibility would likely be lower as the accounts receivable remained in default and outstanding for a longer period.

**[*78]** To generate collection at those rates in the short term, a rational investor would expect from an economic perspective that Gramercy would have some competitive advantage in collecting these types of debts and be aggressively pursuing the debtors. In fact, Gramercy did not have such a competitive advantage as its expertise and skills lay in sovereign and corporate debt instruments and not consumer receivables. Nor had Gramercy expended any efforts, not to mention extraordinary efforts, to pursue the debtors to improve collection or encourage positive restructuring outcomes. Indeed, neither Saratov nor Gramercy ever collected on the receivables. Moreover, substantial appreciation in the ruble was a necessary condition for the transactions to turn a profit in all cases, but the record shows no credible evidence that any of the participants in the transactions expected or even contemplated that this would occur.

Petitioners argue that there were ways other than collection for the transactions to be profitable: restructuring the receivables, selling the receivables, and speculating on the ruble. Petitioners also argue that Mr. Cochran's and Mr. Perlman's investments in the managed EMF accounts (i.e., the second component the managed account that tracked the GEMF) gave the transactions economic substance. We disagree.

**[\*79]** The prospect of any positive restructuring of defaulted debts is inextricably tied to the debts' collectibility and the debtors' business fundamentals. As we noted, weak collection prospects render any favorable restructuring difficult. Because the substantial transaction costs exceeded the Buyuk and Beyazit receivables' values determined on the basis of full collection, any restructuring had to do better than what a combination of collection rates and favorable exchange rate movement could yield in order to cover costs and generate profits. Generally, as an economic and commercial matter, it is difficult for a holder of highly distressed, long overdue debts to restructure the debts and to perform better than collection on a dollar-to-dollar basis; i.e., if current collectibility is $10, the net present value of the restructured debt, discounted for any market risks, will unlikely exceed $10 absent strong fundamentals in the debts or the debtor's business. Particularly in these cases, we cannot see how a rational investor could have reasonably expected a favorable restructuring outcome given our conclusion that the receivables had little value, rendering collection unlikely, and the lack of any evidence of strong fundamentals in the debts or the debtors. Further, as we have said elsewhere, no one actually expended efforts to induce the debtors to negotiate to restructure the accounts receivable, and Gramercy was simply sitting on the sidelines and failed to be proactively involved in any restructuring process.

[*80] Thus, we find that a rational investor could not have legitimately expected positive restructuring outcomes on these facts.

As to speculation on the ruble, collection would remain in the equation in most cases. Figure 1 shows that 20% appreciation in the ruble was necessary to generate any profits assuming 100% collection. Even if the ruble appreciated by 50%, the collection rate would still have to be approximately 50%. And assuming no collections and relying on the assumption that the net value of 7.38% was commercially reasonable, there had to be an 83% appreciation in the ruble for the transactions to break even. There is no credible evidence that there was any realistic expectation that the ruble would appreciate in that magnitude.

Because it could not have been reasonably expected that positive economic outcomes could result from collection, restructuring, or currency speculation, no economically rational investor would have bought the receivables from the partnerships unless that investor were also tax motivated. Thus, petitioners cannot claim as a matter of law that they could have legitimately expected profits from the transactions by selling the receivables to someone else.

We must also reject petitioners' suggestion that our economic substance analysis should take into account Mr. Cochran's and Mr. Perlman's investments in the managed EMF accounts. The investments in the managed EMF accounts were

[*81] economically independent from the investments in the DAD accounts--that is, Messrs. Cochran and Perlman could invest in the GEMF directly without investing in the DAD accounts;[26] nor did the managed EMF accounts have any impact on the fundamental economics of the Saratov receivables or serve as a hedge against the DAD accounts when the DAD accounts were on a pretax basis sure losing investments to begin with. It would be a far cry from the essence of the doctrine of economic substance if we allowed a taxpayer to instill substance in an economically nonviable transaction by bundling it with an economically unrelated transaction bearing some stuff of substance. "[O]ne economically beneficial component of a much larger, complex transaction * * * does not impart

---

[26]Further, Messrs. Cochran and Perlman could have invested directly in the GEMF without incurring the additional 2% asset management fee that provided no incremental benefit to them because Gramercy's investment strategies as to the managed EMF accounts were identical to those employed on the GEMF. Hence, the additional fee can only be attributed to the DAD account component, which our opinion today explains did not bear any valid nontax business purpose or pretax profit potential.

As Dr. Cragg correctly points out in his report, we can also ignore Mr. Cochran's contribution of his Goldman Sachs account to Boyalik and Mr. Perlman's contribution of his Goldman Sachs account and partnership interest in Ovenworks to RP Capital. These assets were used to increase Mr. Cochran's and Mr. Perlman's outside bases so that they could take the tax losses when Buyuk and Beyazit sold the receivables and appeared to sit in the higher tiered LLCs walled off from the managed accounts. Thus, these assets did not affect the fundamental pretax economics of the transactions.

**[\*82]** economic substance to the larger \* \* \* transaction." <u>WFC Holdings Corp. v. United States</u>, 728 F.3d at 746.

At the end, the transactions here yielded only nominal economic gains, and thus the claimed tax losses bore no relationship to the economic reality of the transactions. There was never a legitimate or reasonable expectation of pretax profits in these cases. We thus find that the transactions lacked objective economic substance.

### Subjective Test

The second part of the economic substance analysis inquires whether a taxpayer has subjective nontax reasons to enter into a transaction and whether he or she has a legitimate profit motive for doing so. <u>Rice's Toyota World, Inc. v. Commissioner</u>, 752 F.2d at 92. Whether a transaction is conducted with a subjective business purpose depends on a number of subfactors, including whether: (1) the taxpayer had a valid nontax business purpose for entering into the transaction; (2) the transaction was negotiated and entered into at arm's length; (3) the taxpayer performed due diligence regarding the commercial viability and market risks of the transaction; (4) in the case of a partnership, the partners intended to join together for the present conduct of an undertaking or enterprise; and (5) the transaction was marketed as a tax shelter in which the purported tax

[*83] benefit significantly exceeded the taxpayer's actual investment. Rovakat v. Commissioner, 102 T.C.M. (CCH) at 274. These subfactors are not exclusive, and no one subfactor is controlling. Id.

As we discussed earlier, petitioners claim there were four ways for the transactions to be profitable. We have already rejected petitioners' claims, and we need not repeat them here. It suffices to say that petitioners have not shown any valid business purpose for engaging in the transactions but for the expected tax losses inherent in the receivables. No part of the overall transaction was "rationally related to a useful nontax purpose that is plausible in light of the taxpayer's conduct and useful in light of the taxpayer's economic situation and intentions * * * [all] evaluated in accordance with commercial practices in the relevant industry." ACM P'ship v. Commissioner, 73 T.C.M. (CCH) at 2217.

Nor was any part of the overall transaction negotiated at arm's length. Gramercy and its related entities were on all sides of the transactions. When Saratov purportedly transferred the Saratov receivables to EROSE, Gramercy determined the value to be 7.38% of the face amount; Saratov was also promised 5% of the face amount. However, neither of these two valuations came close to the fair market value of the Saratov receivables. The amounts Messrs. Cochran and Perlman committed to invest under their respective IMAs were determined

**[*84]** solely as percentages of the anticipated tax losses and did not appear commensurate with their judgment of Gramercy's competence and track record as an investment adviser. The eventual sales of the Buyuk and Beyazit receivables were simply an internal shuffling between Gramercy's managed accounts that, as we concluded earlier, had little economic significance. Finally, the collection agreement was commercially unreasonable. Simply put, the transactions at issue were highly structured with the only end game of generating tax losses.

We have noted elsewhere that there is a lack of credible evidence showing anyone had conducted the level of due diligence commensurate with the complexity and the magnitude of the transactions at hand. Petitioners' vague claim that Mr. Helie and Mr. Shanbrom had gone to Russia to perform due diligence is simply insufficient given the many uncertainties implicated by the transactions.

Our analysis under disguised sales concepts clearly shows Saratov and Gramercy did not join together for the present conduct of an undertaking or enterprise. See Rovakat v. Commissioner, 102 T.C.M. (CCH) at 275-276. EROSE never endeavored to pursue the stated business purpose to collect on the Saratov receivables, restructure the debts, or seek an independent, third-party buyer of the receivables. This was also true for Boyalik/Buyuk and RP

[*85] Capital/Beyazit because the economic arrangements did not change at these lower level LLCs.

Further, our opinion also shows that the structure at issue was not necessary for Messrs. Cochran and Perlman to achieve their stated business objectives; indeed, Messrs. Cochran and Perlman incurred additional transaction costs as a result of the BDO distressed debt structure as compared to direct investments in the GEMF. Mr. Cochran's and Mr. Perlman's stated desire to seek liability protection to explain why they decided to join with Gramercy in the LLCs was also not supported by the credible evidence in the record. As to Gramercy, its reason to participate in the undertaking appeared to be to earn fees that it would not have earned from typical hedge fund accounts and also to acquire new clients. But these purposes bore no relationship to the stated business purpose of the enterprise; instead they were merely incentives to induce Gramercy to help facilitate the tax-motivated transactions.[27] Thus, the parties at each step of the transaction did not intend to join together in the present conduct of an economically viable enterprise, and the overall structure was not a "genuine multiple-party transaction". See Frank Lyon Co., 435 U.S. at 562.

---

[27]Moreover, as a sharp departure from its normal business practice with respect to the GEMF, Gramercy had an equity interest in an LLC involved in the BDO distressed debt structure that required the forming of a partnership.

**[\*86]** Finally, the BDO distressed debt structure was marketed as a tax shelter to Messrs. Cochran and Perlman. Mr. Shanbrom, who was the person pitching the tax sheltering product to Messrs. Cochran and Perlman, acknowledged that the BDO structure was always marketed to investors as a tax shelter.

For these reasons, in the light of the economic and commercial reality underlying the transactions at issue, we find the transactions also lacked any bona fide profit objective.

<u>Conclusion</u>

In sum, our unitary analysis of the two prongs of the economic substance doctrine shows an economically rational investor could not have legitimately expected any pretax profit potential in the Buyuk and Beyazit transactions, which did not serve any valid nontax business purpose. We thus find the transactions lacked economic substance.

<u>Accuracy-Related Penalties</u>

Section 6662(a) and (b)(1), (2), and (3) provides that a taxpayer may be liable for a 20% accuracy-related penalty on the portion of an underpayment attributable to, among other things, negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement. Section 6662(h)(1) increases the penalty from 20% to 40% to the

[*87] extent that the underpayment is attributable to a gross valuation misstatement. A gross valuation misstatement exists where the value or adjusted basis of the property claimed on a return is 400% or more of the amount determined to be correct. Sec. 6662(h)(2)(A). If the value or adjusted basis of the property is determined to be zero, the gross value misstatement penalty is applicable. Sec. 1.6662-5(g), Income Tax Regs. In the Court of Appeals for the Second Circuit, a gross valuation misstatement exists and thus the 400% penalty applies where a claimed tax benefit is disallowed for lack of economic substance. Gilman v. Commissioner, 933 F.2d at 150-152.

An accuracy-related penalty under section 6662 does not apply to any portion of an underpayment, however, for which a taxpayer had reasonable cause and acted in good faith. Sec. 6664(c)(1). For partnerships, we inquire into a taxpayer's reasonable cause and good faith, or lack thereof, at the partnership level, taking into account the state of mind of the general partner. New Millennium Trading, LLC v. Commissioner, 131 T.C. 275, 279-280 (2008).

Under any of the three grounds on which we sustain respondent's disallowance of the claimed loss deductions, Buyuk and Beyazit grossly misstated the values of their bases in the Buyuk and Beyazit receivables. Thus, respondent has proved his prima facie case to impose the penalties.

**[\*88]** On brief, petitioners did not advance any arguments or articulate any reasons as to why the accuracy-related penalties are not warranted. Thus, we find that petitioners have conceded the issue and sustain respondent's determination of the penalties. Zapara v. Commissioner, 124 T.C. 223, 233 (2005), aff'd, 652 F.3d 1042 (9th Cir. 2011); see also Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

_____

Any arguments not discussed in this opinion are irrelevant, moot, or lacking in merit.

To reflect the foregoing,

Decisions will be entered under Rule 155.